DISTRICT COURT CASE NO. 2:17-CV-04157-RGK

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JENNIFER MORGAN

Appellant and Cross-Appellee,

v.

HEIDE KURTZ, PLAN TRUSTEE

Appellee and Cross-Appellant.

---

On Appeal from the United States Bankruptcy Court
for the Central District of California
The Honorable Barry Russell, United States Bankruptcy Judge

---

OPENING BRIEF OF APPELLEE AND CROSS-APPELLANT

---

SMILEY WANG-EKVALL, LLP
Lei Lei Wang Ekvall, State Bar No. 163047 lekvall@swelawfirm.com
Kyra E. Andrassy, State Bar No. 207959 kandrassy@swelawfirm.com
Robert S. Marticello, State Bar No. 244256 rmarticello@swelawfirm.com
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Telephone:  714 445-1000
Facsimile:   714 445-1002
Attorneys for Appellee and Cross-Appellant, Heide Kurtz, Plan Trustee

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..........................................................................1

    A.      Summary of Appeal..........................................................1

    B.      Summary of Background Facts .........................................2

II.     JURISDICTIONAL STATEMENT ................................................5

III.    STATEMENT OF ISSUES ON APPEAL ......................................6

IV.     STANDARD OF REVIEW .............................................................7

V.      STATEMENT OF BACKGROUND FACTS...................................8

    A.      The Club's Background ....................................................8

    B.      Defendant Morgan's Takeover of Control .........................9

        1.      Gaining Control.......................................................10

        2.      The First Deed of Trust Against the Property and the Club's First Bankruptcy Case.....................................11

        3.      The Second Deed of Trust Against the Property .....................12

        4.      The Second TRO and Third TRO............................13

        5.      The Third and Fourth Deeds of Trust ......................13

        6.      The Scapa Loan.......................................................16

        7.      The Club's Second Voluntary Bankruptcy Case.....................21

        8.      The Club's Third Voluntary Bankruptcy Case.........................21

VI.     THE ADVERSARY PROCEEDING...............................................22

VII.    EXPERT TESTIMONY REGARDING DAMAGES ..................................23

VIII.   THE TRIAL...................................................................................26

IX.     ARGUMENT.................................................................................28

    A.      The Bankruptcy Court Did Not Err in Finding Morgan Liable for Breach of Fiduciary Duty ............................................28

        1.      Morgan Breached Her Fiduciary Duties to the Club and Caused the Club to Incur an Unauthorized Secured Hard Money Loan that She Knew or Should Have Known that

the Club Could Not Repay and that Was for the Benefit of Herself and Other Insiders of the Club ................................. 28

    (a)   As a Director and Officer of the Club, Morgan Owed Fiduciary Duties to the Club ................................ 29

    (b)   Morgan Breached her Fiduciary Duties to the Club ....... 29

2.   The Bankruptcy Court Did Not Err in Finding That There Was No Contractual Basis for Morgan to Receive a Portion of the Scapa Loan Proceeds ......................................... 33

B.   The Bankruptcy Court Erred in Calculating the Amount of Damages for Morgan's Breach of Fiduciary Duty ............................. 36

1.   The Bankruptcy Court Erroneously Focused Its Analysis on the Amount Morgan Received as a Result of Her Fiduciary Duty and Not on the Amount of Damage Her Breach Caused the Club ............................................................ 36

2.   The Bankruptcy Court Abused Its Discretion in Striking the Trial Declaration of Trustee's Expert Witness Don T. Fife, CPA and Excluding the Trial Testimony of Don T. Fife, CPA ................................................................... 40

3.   Although the Bankruptcy Court Erred in Calculating Damages, It Properly Included the Amounts Morgan Received, Including the $6,400 Payment ................................. 46

4.   The Bankruptcy Court Erred in Applying the Federal Interest Rate in Calculating the Prejudgment Interest ............. 48

X.   CONCLUSION ................................................................................. 50

CERTIFICATE OF COMPLIANCE ....................................................... 52

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ambassador Hotel Co., Ltd. v. Wei-Chuan Investment,*
  189 F.3d 1017, 1024 (9th Cir. 1999)(..............................................................7

*Andersen v. City of Bessamer City, N.C.,*
  470 U.S. 564, 573 (1985) .............................................................................7

*Children's Hospital and Medical Center v. Bonta,*
  118 Cal. Rptr. 2d 629, 775 (Cal. Ct. App. 2002) .........................................49

*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
  68 Al. App. 445, 483 (1998)..........................................................................28

*Cooter & Gell v. Hartmarx Corp.,*
  496 U.S. 384, 405 (1990) ...............................................................................8

*Feder v. Lazar (In re Lazar),*
  83 F.3d 306, 308 (9th Cir. 1996) ...................................................................7

*Frances T. v. Village Green Owners Ass'n,*
  42 Cal. 3d 490, 513 (1986) ...........................................................................28

*Galindo v. Stoody Co.,*
  793 F.2d 1502, 1516 (9th Cir. 1986) .............................................................7

*General Elec. Co. v. Joiner,*
  522 U.S. 136, 141-42 (1997) ...........................................................................8

*GHK Assocs. v. Mayer Group, Inc.,*
  224 Cal. App. 3d 856, 873-74 (1990).............................................................37

*Heritage Bank v. Redcom Labs., Inc.,*
  250 F.3d 319, 329 (5th Cir. 2001) .................................................................35

*In re  Keefe,*
  401 B.R. 520, 526 (1st Cir. B.A.P. 2009)................................................. 8, 49

*In re Dalen,*
  259 B.R. 586, 610 (Bankr. W.D. Mich. 2001) ..............................................30

*In re Verisign, Inc., Deriv. Litig.,*
  531 F.Supp.2d 1173, 1215-15 (N.D. Cal. 2007) ...........................................28

*McNerney v. Archer Daniels Midland Co.,*
  164 F.R.D. 584, 586 (W.D.N.Y. 1995) .........................................................43

*Meister v. Mensinger,*
  230 Cal. App. 4th 381, 396 (2014) ..................................................... 37, 39

*New Amsterdam Cas. Co. v. Waller,*
  323 F.3d 20, 24 (4th Cir. 1963) ........................................................... 36

*Oak Harbor Freight Lines, Inc. v. Sears Roebuck, & Co.,*
  513 F. 3d 949, 954 (2008) ........................................................................ 8

*Pereira v. Goldberger (In re Stephen Douglas, Ltd.),*
  174 B.R. 16, 22 (Bankr. E.D.N.Y. 1994) ............................................. 49

*Professional Hockey Corp. v. World Hockey Ass'n,*
  143 Cal. App. 3d 410, 414 (1983) ..................................................... 29, 30

*School Dist. No. 1J, Multnomah County, Oregon v. ACandS, Inc.,*
  5 F.3d 1255, 1263 (9th Cir. 1993) ........................................................ 43

*Sullivan v. Glock, Inc.,*
  175 F.R.D. 497, 506-07 (Fed. Cir. 1997) ............................................. 44

*United States v. Chapman Univ.,*
  245 F.R.D. 652 (C.D. Cal. 2007) .......................................................... 41

*United States v. United States Gypsum Co.,*
  333 U.S. 364, 395 (1948) ......................................................................... 7

*Yeti by Molly Ltd. v. Deckers Outdoor Corp.,*
  259 F.3d 1101 (9th Cir. 2001) ................................................................ 41

*Zone Sports Ctr., LLC v. Nat'l Sur. Corp.,*
  2012 WL 1969048 (E.D. Cal. May 31, 2012), .................................. 41, 44

## STATUTES

11 U.S.C. § 541 ............................................................................................. 48

28 U.S.C. § 158(a)(1) ..................................................................................... 5

Cal. Corp. Code § 207(g) ............................................................................. 31

Cal. Corp. Code § 2116 ................................................................................ 28

Cal. Corp. Code § 300(a) ............................................................................. 31

Cal. Corp. Code § 5231(a) ........................................................................... 29

## OTHER AUTHORITIES

Cal. Const., art. 15, sec. 1 ............................................................................ 49

Law of Corp. Officers & Dir.: Indemn. & Ins. § 1:36 .............................. 30

## **RULES**

Federal Rule of Bankruptcy Procedure 8005.............................................................5

Federal Rule of Civil Procedure 26 ................................................................ passim

Federal Rule of Civil Procedure 26(a) .....................................................................44

Federal Rule of Civil Procedure 26(a)(2)(B) ............................................. 24, 40, 41

Federal Rule of Civil Procedure 37 .........................................................................44

Federal Rule of Civil Procedure 37(c)(1) ................................................................44

# I.     INTRODUCTION

## A.     Summary of Appeal

This appeal arises from an adversary proceeding filed by Heide Kurtz, the former chapter 11 trustee and presently the Plan Trustee (the "Trustee") for The Woman's Club of Hollywood (the "Club"), which filed a voluntary chapter 11 bankruptcy petition in December 2012, bearing case number 2:12-bk-50767-BR (the "Bankruptcy Case").  The Trustee sued several officers and directors of the Club, including Jennifer Morgan, the Club's CEO, executive director, treasurer, and board member, and her fellow board member Alda Shelton, the Club's officer and attorney, for breach of fiduciary duty, among other claims.  After a multi-day trial, the bankruptcy court concluded that there was no board approval for several secured loans that defendants Morgan and Shelton caused the Club to obtain, primarily for their own benefit, during the short time they controlled the Club and that left the Club unable to pay its debts.  Not surprisingly, when the Club defaulted, Shelton filed the Bankruptcy Case to halt the lender's foreclosure sale.

While the bankruptcy court found Morgan liable for breach of her fiduciary duties to the Club and entered a judgment against her, it erroneously focused its calculation of damages on what Morgan received as a result of her breach, and not on the damages her misconduct caused to the Club.  As a result, it only awarded $160,903.48 in damages against Morgan, for amounts that she received, instead of

damages of at least $1,616,886.96, representing the amount that the Club will have to pay to the lender for the loan that the Club should not have obtained. Morgan appealed the adverse judgment entered against her and the Trustee filed a cross-appeal regarding the calculation of damages. The Trustee also appealed the bankruptcy court's decision regarding Shelton, because although the court found that she had breached her fiduciary duty, it awarded no damages because it again applied the incorrect law on damages. That appeal is pending before this Court as case number 2:17-cv-04251-RGK.

## B.    Summary of Background Facts

The Club is a historic non-profit organization that was founded in 1905. According to its member handbook, its mission "is to raise awareness of the Arts, helping and serving the community and fundraising for charities." The Club owns real property located at 1741, 1749 and 1751 N. La Brea Ave., Los Angeles, California 90046 (the "Property"). The Property is located in the heart of Hollywood, approximately two blocks from Grauman's Chinese Theatre. The Property, valued between $6.5 million and $8.5 million, is extremely valuable and was unencumbered for decades by *any* liens. Then, starting in late 2010, Morgan and Shelton wrested control of the Club and its valuable Property from the Club's aging and declining members for the purpose of enriching themselves at the expense of the Club and its legitimate members. In less than 18 months, Morgan

and Shelton encumbered the Property with a number of unauthorized liens, including a $100,000 lien in favor of Morgan and culminating in a lien that secured a hard money loan of $700,000, the proceeds of which were used to benefit various officers and members of the Club's board, including Morgan and Shelton.

Morgan, the Club's executive director, chief executive officer ("CEO"), treasurer, and board member, with the help of Shelton, the Club's attorney, officer, and board member, obtained and retained control of the Club and its valuable Property.  Morgan hired Shelton, the Club's attorney, as well as an officer and director, to defend her against actions by the Club's members to oust Morgan. Morgan caused the Club to file three voluntary bankruptcy cases within the span of two years to avoid a receiver, and later, to stay the foreclosure sale by the hard money lender.  Morgan took numerous other actions to further her own self-interest to the detriment of the Club and the Property.  In mid-2011, when it appeared that Morgan and Shelton may lose control of the Club to a receiver, they burdened the Club with several unauthorized liens, including a lien in favor of Morgan for $100,000, which the Club's board never authorized.  Then, a few weeks after giving herself a lien, Morgan obtained a $700,000 hard money loan from Scapa & Associates (the "Scapa Loan"), which the Club's board never authorized.  Both Morgan and Shelton knew that the Club did not have any ability to repay the Scapa Loan.  In fact, all of the payments made to service the Scapa

Loan were made with proceeds of the Scapa Loan.  Regardless of the lack of board approval, Shelton created a fraudulent resolution that she presented to Scapa stating that the board had approved the Scapa Loan and Morgan signed the loan documents as the Club's CEO.  Morgan and Shelton then used most of the Scapa Loan proceeds to pay themselves and their friends.

When the proceeds of the Scapa Loan were exhausted and the Scapa Loan could not be serviced, the Club defaulted and Scapa commenced a foreclosure action.  On the eve of Scapa's foreclosure sale in December 2012, Morgan, as the Club's CEO and Shelton, as the Club's attorney, filed this Bankruptcy Case to stay the foreclosure sale.  Under the confirmed chapter 11 plan, the Club must repay Scapa more than $1.6 million in order to retain the Property.

As the executive director, CEO and board member of the Club, Morgan was a fiduciary of the Club.  Morgan, together with Shelton, breached her fiduciary duty to the Club by giving herself a $100,000 lien against the Property that was never authorized by the Club's board, and obtaining the Scapa Loan, which mired the Club in debt that it would be unable to pay.  Morgan also obligated the Club on other secured loans that the Club's board never authorized for her own benefit.  These loans provided funds directly to Morgan as well as funded legal fees to keep Morgan in control of the Club and its Property.  These loans were instrumental in Morgan's and Shelton's scheme to wrest control of the Club away from its

legitimate members and to gain control of the Property for their benefit.

Although the bankruptcy court correctly found that Morgan had breached her fiduciary duty, it erred in how it calculated damages by focusing on what Morgan received and not on the damages to the Club proximately caused by Morgan's misconduct and breach. It also erred in striking the testimony of the Trustee's accountant, Don Fife, which would have assisted the bankruptcy court in its damage calculation. The bankruptcy court's judgment should be reversed and remanded with instructions to enter a judgment in the amount of $1,616,886.96 for the damage Morgan caused to the Club.

## II.   JURISDICTIONAL STATEMENT

The bankruptcy court entered its judgment against Morgan on May 23, 2017. A copy of the judgment is attached to the Appellee's Excerpts of Record ("Appellee's ER") at Tab 1. Morgan timely filed a notice of appeal, electing to have it heard by the United States District Court. (Appellant's App., Exhs. 17-18). Pursuant to Federal Rule of Bankruptcy Procedure 8002(a)(3), the Trustee timely filed her own notice of appeal of the judgment against Morgan. A copy of the Trustee's notice of appeal is attached to the Appellee's ER at Tab 2. Pursuant to 28 U.S.C. § 158(a)(1) and Federal Rule of Bankruptcy Procedure 8005, this Court has proper jurisdiction of this appeal.

On appeal, Morgan argues that the Trustee did not have standing to bring the action against her and therefore the bankruptcy court erred in awarding a judgment in favor of the Trustee.  This argument is nonsense and was correctly rejected by the bankruptcy court.  The Trustee was appointed as the chapter 11 trustee and, once her chapter 11 plan (the "Plan") was confirmed, became the plan trustee.  *See Order Confirming Chapter 11 Trustee's Chapter 11 Plan of Reorganization (Dated April 8, 2014) [As Amended by Docket No. 442 Filed on July 2, 2014], as Modified by this Court Order* at 74, attached to the Appellee's ER as Tab 3.  The confirmed Plan and the order approving it appointed the Trustee as the "plan trustee" and Section III.F.4. of the Plan specifically vested the Trustee with standing to continue the litigation against Morgan and Shelton.  *See Trustee's Chapter 11 Plan of Reorganization (Dated April 8, 2014)*, Appellee's ER, Tab 4 at 107.  Section III.F.8. of the Plan also explicitly provided that the plan trustee would serve as the successor to the chapter 11 trustee for all purposes.  *See* Plan at 109.  Accordingly, there is no question that the Trustee has at all times had standing to prosecute this litigation and this appeal.

## III.   STATEMENT OF ISSUES ON APPEAL

1.   Did the bankruptcy court err in finding that Morgan breached her fiduciary duty to the Club?

2.      When calculating damages for Morgan's breach of fiduciary duty, did the bankruptcy court err by focusing on what Morgan received instead of the damages proximately caused to the Club by her misconduct?

3.      Did the bankruptcy court err in striking the declaration of the Trustee's expert witness, Don T. Fife, CPA, and excluding his testimony at trial?

4.      Did the bankruptcy court err in using the federal rate of interest, rather than applying California law in calculating prejudgment interest?

## IV.    <u>STANDARD OF REVIEW</u>

A bankruptcy court's conclusions of law are reviewed de novo.  *See Feder v. Lazar (In re Lazar)*, 83 F.3d 306, 308 (9th Cir. 1996).  A lower court's findings of fact after a bench trial are reviewed for clear error.  *See Ambassador Hotel Co., Ltd. v. Wei-Chuan Investment*, 189 F.3d 1017, 1024 (9th Cir. 1999)(citations omitted).   Clear error occurs when "'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  *Andersen v. City of Bessamer City, N.C.*, 470 U.S. 564, 573 (1985)(quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).  Whether the bankruptcy court applied the correct legal standard in calculating damages is a question of law that is reviewed de novo.  *See Galindo v. Stoody Co.*, 793 F.2d 1502, 1516 (9th Cir. 1986)(citation omitted).  Whether state

or federal law applies to determine amount and availability of prejudgment interest is purely a legal question that is reviewed de novo.  *See In re  Keefe*, 401 B.R. 520, 526 (1st Cir. B.A.P. 2009); *Oak Harbor Freight Lines, Inc. v. Sears Roebuck, & Co.*, 513 F. 3d 949, 954 (2008).

A trial court's evidentiary rulings are reviewed for an abuse of discretion. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 141-42 (1997).  A bankruptcy court abuses its discretion where it bases its decision on an erroneous view of the law of clearly erroneous factual findings.  *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990).

## V.  STATEMENT OF BACKGROUND FACTS

### A.  The Club's Background

The Club is a California non-profit social welfare organization founded in 1905.  (First Amended Complaint, Appellant's App., Exh. 1, at 16; February 27, 2012 341(a) Transcript at 364:21-22, Trial Exh. 196, Appellee's ER, Tab 5 at 227:17-22; Decl. of Jennifer Morgan dated 01/08/13 ("Morgan Decl."), Trial Exh. 171, Appellee's ER, Tab 6 at 275:22-24).  The Club had a storied history that included a school for girls and membership events that included the likes of Charlie Chaplin.  The Club's meetings, social functions, fundraisers, and charitable events were held at the Property.  (March 10, 2011 341(a) Transcript, Trial Exh. 195, Appellee's ER, Tab 7 at 326:17-20; 2011 Amended Bylaws, Trial Exh. 19,

Appellee's ER at Tab 8, p. 364; Restated Articles of Incorporation, Trial Exh. D5, Appellee's ER at Tab 9, p. 374).

The Club owned the Property free and clear of liens for many decades.  (FY 2008-09 Tax Return, Trial Exh. 269, Appellee's ER at Tab 10; FY 2009-10 Tax Return, Trial Exh. 270, Appellee's ER at Tab 11).  Over the years, the Property, which is located two blocks from Grauman's Chinese Theatre in the heart of Hollywood, became extremely valuable.  (Morgan Decl., Trial Exh. 171, Appellee's ER, Tab 6, at 275:16-23; Vicinity Map from Expert Cole's Report, Trial Exh. 112, Appellee's ER, Tab 12, at 428).  When the Bankruptcy Case was filed, Morgan and Shelton valued the Property to be worth $6 million.  (Schedule "A" filed under penalty of perjury in the Bankruptcy Case on December 13, 2012, Trial Exh. 225, Appellee's ER, Tab 13).

## B.     Defendant Morgan's Takeover of Control

By the early 2000s, the Club's members were aging, membership had declined, and the Club, with its valuable unencumbered Property, was vulnerable. (Trial Decl. of Jennifer Morgan, Appellee's ER, Tab 14, pp. 637-38, ¶ 26).  In or around 2009, Nina Van Tassell, a member of the Club, introduced Morgan to the Club.  (*Id.* at p. 637, ¶ 23.)  Morgan touted her experience with working with non-profit organizations, and by 2010, she had ingratiated herself with the Club's aging members and become the Club's executive director.  (*Id.* at pp. 637-38, ¶¶ 23, 26).

In late 2010, through a series of allegedly improperly noticed meetings and elections and by manipulating membership dues, Morgan took over control of the Club with a newly elected board and new bylaws.  (Complaint filed in the Quick Action, Trial Exh. 198, Appellee's ER, Tab 15, p. 730, ¶ 14; Trial Decl. of Lorraine Genovese, Appellee's ER, Tab 16, pp. 748-49, ¶¶9, 11).  Van Tassell, Morgan's friend, became president of the Club and Morgan was placed in control of the Club's daily operations.  (Genovese's Trial Decl., Appellee's ER, Tab 16, p. 749, ¶¶ 13, 15).

     1.   <u>Gaining Control</u>

In January 2011, members who were not a part of Morgan's takeover plan became concerned with the actions being taken by Morgan and Van Tassell.  These members (the "Quick Plaintiffs") filed an action (the "Quick Action") in the Los Angeles Superior Court, and sought a preliminary injunction and the appointment of a receiver.  Morgan, Van Tassell and the Club were named defendants in the lawsuit.  (Complaint filed in the Quick Action, Trial Exh. 198, Appellee's ER, Tab 15; Mot. for Prelim. Inj. filed in the Quick Action, Trial Exh. 199, Appellee's ER, Tab 17).  On January 11, 2011, the Superior Court issued a restraining order (the "First TRO") prohibiting any changes to the Club's bylaws, the sale or alienation of the Club's assets, or making any changes to the corporate status of governance of the Club until a court-appointed receiver could oversee an election pursuant to the

2005 bylaws.  (Trial Exh. 200, Appellee's ER, Tab 18).

Unfortunately, the restraining order came a few days too late.  While the motion for preliminary injunction was pending but before the Superior Court issued its order, Morgan held a meeting on January 8, 2011, that led to the election of a new board and the adoption of new bylaws.  (2011 Amended Bylaws, Trial Exh. 19, Appellee's ER, Tab 8; Jan. 8, 2011 Meeting Minutes, Trial Exh. 7, Appellee's ER, Tab 19).  Morgan was a member of this board and was designated the chief executive officer and treasurer.  (Jan. 8, 2011 Meeting Minutes, Trial Exh. 7, at Appellee's ER, Tab 19).

     2.    The First Deed of Trust Against the Property and the Club's First Bankruptcy Case

A few days after the Superior Court issued the First TRO, Morgan began encumbering the Property for her own benefit.  On January 18, 2011, a deed of trust executed by Van Tassell and another board member, Michael Wallace, was made in favor of Van Tassell's husband, Carl Von Randallhoff, to secure a loan in the amount of $25,000 (the "First Von Randallhoff Deed of Trust").  (Appellee's ER, Tab 20.)[1]  Morgan caused the Club to borrow $25,000 from Von Randallhoff to pay fees to a bankruptcy attorney to stay both the Quick Action and the efforts to dispossess Morgan.  (Corporate Resolution Authorizing the Borrowing of

---

[1] The First Von Randallhoff Deed of Trust was admitted at trial as Exh. 70.  However, due to the document's illegibility, a certified copy, which was also available at trial, is being submitted as part of the Trustee's Excerpts of Record.

Funds, Trial Exh. 79, Appellee's ER, Tab 21).  Two days after Von Randallhoff

received his lien, Morgan caused the Club to file a voluntary petition under

Chapter 11 of the Bankruptcy Code, which was assigned case number 2:11-bk-

12572-BR.  (Trial Exh. 206, Appellee's ER, Tab 22).  According to the Club's

bankruptcy schedules, the Club's debts at that time only totaled $125,000.  (Trial

Exh. 207, Appellee's ER, Tab 23, p. 931).  The First Von Randallhoff Deed of

Trust was the only lien that encumbered the Property.  (*Id.* at p. 937).  The Quick

Plaintiffs filed a motion to dismiss the bankruptcy case and the bankruptcy court

granted that motion.  (Docket Report for first bankruptcy, Trial Exh. 210,

Appellee's ER, Tab 24, p. 966-68).

      3.    <u>The Second Deed of Trust Against the Property</u>

      On April 12, 2011, one day before the Club's first bankruptcy case was

officially dismissed, Morgan caused the Club to grant a second deed of trust (the

"Second Von Randallhoff Deed of Trust") in favor of Von Randallhoff in the

amount of $25,000.  (Appellee's ER, Tab 25).[2]  The Second Von Randallhoff Deed

of Trust was recorded on April 18, 2011.  (*Id.* at p. 973.)  Both the First Von

Randallhoff Deed of Trust and the Second Von Randallhoff Deed of Trust were

granted after the issuance of the First TRO, pursuant to which the Superior Court

---

[2] The Second Von Randallhoff Deed of Trust was admitted at trial as Exh. 81.  However, due
to the document's illegibility, a certified copy, which was also available at trial, is being
submitted as part of the Trustee's excerpts of record.

prohibited any alienation of the Club's assets.

4.   The Second TRO and Third TRO

On April 26, 2011, after the First Bankruptcy Case was dismissed, the Superior Court entered a second order (the "Second TRO") preventing Morgan, Van Tassell, and the Club from making any changes to the Club's 2005 bylaws, selling or alienating the Club's assets, or "making any changes to the corporate status, structure, and/or governance of the [Club]," until after an election overseen by the court-appointed receiver in conformance with the 2005 by-laws.  (Trial Exh. 201(a), Appellee's ER, Tab 26).  Pursuant to the Second TRO, the Superior Court appointed Evelyn Carlson as the receiver.  (*Id.*)  On the same date, the Superior Court also entered an order (the "Third TRO") prohibiting Morgan and Van Tassell from "selling, leasing, and/or otherwise alienating any and all property of the [Club]."  (Trial Exh. 201, Appellee's ER, Tab 27).

By early May 2011, Morgan had retained Shelton to represent her, Van Tassell, and the Club as their attorney in the Quick Action.  (Trial Decl. of Alda Shelton, Appellee's ER, Tab 28, p. 986, ¶ 6.)  At the same time, Shelton also became an officer and director of the Club.  (*Id.* at pp. 987-988, ¶ 9.)

5.   The Third and Fourth Deeds of Trust

Notwithstanding the three TROs issued in January and April 2011, Morgan, Shelton, and Van Tassell caused the Club to issue a third deed of trust

encumbering the Property.  This deed of trust was executed by Van Tassell in favor

of Morgan in the amount of $100,000 (the "Morgan Deed of Trust").  (Trial Exh.

137, Appellee's ER, Tab 29).  The Morgan Deed of Trust was recorded on June 15,

2011.  (*Id.* at p. 1236).  Morgan and Shelton have alleged that the Morgan Deed of

Trust secured a $100,000 note in her favor related to an alleged past due salary

obligation of $8,000 per month. (Trial Decl. of Alda J. Shelton at ¶¶ 43-48,

Appellee's ER, Tab 28, pp. 1000-02).  However, the Club did not owe Morgan any

back salary.  The board did not agree to pay her requested salary because the Club

could not afford it.  (Tr. of Proceedings (Day 5, Shelton testimony) at 1376:14-15,

Appellee's ER at Tab 30; Trial Decl. of Lorraine Genovese at 750:5-6, Appellee's

ER at Tab 16).  Board members claimed that they had no knowledge of any

employment contract with Morgan or salary to be paid to her, and believed Morgan

had been working for free.  (Trial Decl. of Beverly Stevens at p. 1522, ¶ 16,

Appellee's ER, Tab 31; Not. of Depo. Test. of Sherita Herring Taken June 29, 2016

at 1538:12-24, Appellee's ER, Tab 32; Trial Decl. of Lorraine Genovese at 750:14-

15, Appellee's ER, Tab 16; Tr. of Proceedings (Feb. 15, 2017) at 1822, Appellee's

ER, Tab 33; Trial Decl. of Ian Duncan at 1844:17-18, Appellee's ER, Tab 34).  In

addition, board members testified that they were not aware of and did not authorize

the granting of a lien in favor of Morgan.  (Trial Decl. of Ian Duncan at 1844:24-

25, Appellee's ER, Tab 34; Trial Decl. of Lorraine Genovese at 750:16-18,

Appellee's ER, Tab 16; Trial Decl. of Beverly Stevens at 1522:23-25, Appellee's ER, Tab 31).

On the same day that Morgan received her note and deed of trust, Morgan, Van Tassell and Shelton caused the Club to borrow another $150,000 from Van Randallhoff (the "Third Von Randallhoff Loan"), to be secured by a deed of trust against the Property (the "Third Von Randallhoff Deed of Trust").  (Trial Exh. 306, Appellee's ER, Tab 35).  The Third Von Randallhoff Deed of Trust was recorded on June 13, 2011.  (*Id.* at p. 1879).  The First Von Randallhoff Deed of Trust and the Second Von Randallhoff Deed of Trust were removed from the Property. Unlike the notes secured by those first two deeds, which carried a 6% interest rate, a two-year maturity and no prepayment penalty, the new note carried a 10% interest rate and guaranteed six months of interest payments in the amount of $7,500.  (Trial Exh. 91, Appellee's ER, Tab 36).  There was no board approval for this loan and there are no board meetings that reflect approval of it.

Morgan and Shelton used the proceeds of this third loan from Von Randallhoff for their own benefit.  From escrow, Morgan caused $25,000 to be sent to an attorney, Jae Kim, who later transferred the funds to Morgan through three separate checks.  (Trial Exh. 105, Appellee's ER, Tab 37 at 1890; Trial Exh. 106, Appellee's ER, Tab 38; Not. of Depo. Test. of Jae Kim Taken May 16, 2014, Appellee's ER, Tab 39 at 1899:2-8, 1901, 1905, 1906:13-1907:5, and 1908).  Mr.

Kim has testified under oath that he had no written engagement agreement with Morgan and did not provide any legal services for her.  (Not. of Depo. Test. of Jae Kim Taken May 16, 2014, Appellee's ER, Tab 39 at 1900 and 1902).  Another $40,000 of the proceeds from the third loan from Von Randallhoff were used for Morgan and Van Tassell's defense of the Quick Action, and Shelton received $20,000 of the proceeds.  (Trial Exh. 105, Appellee's ER, Tab 37 at 1888-89; Trial Exh. 106, Appellee's ER, Tab 38).

6.    <u>The Scapa Loan</u>

In August 2011, with the imminent appointment of a receiver that would divest Morgan and Shelton of control of the Club and the valuable Property, Morgan and Shelton caused the Club to obtain a $700,000 hard money loan from Scapa & Associates ("Scapa").  (Trial Exh. 28, Appellee's ER, Tab 40).  In order to obtain the loan, Morgan signed the loan documents as the Club's CEO (Loan Escrow Instructions, Trial Exh. 10; Amendment to Escrow Instructions, Trial Exh. 11; Borrower Information Sheet, Trial Exh. 12; Seller/Owner's Affidavit and Indemnity, Trial Exh. 13; Beneficiary Morgan's Demand Letter, Trial Exh. 14; Beneficiary Von Randalhoff's Demand Letter, Trial Exh. 16; Borrower's Certification & Authorization, Trial Exh. 20; Occupancy and Financial Status Affidavit, Trial Exh. 21; Mortgage Loan Disclosure Statement, Trial Exh. 23; Payoff Schedule, Trial Exh. 24; Disbursement Instructions, Trial Exh. 25;

Promissory Note, Trial Exh. 26; Lender/Borrower Agreement, Trial Exh. 27; Deed

of Trust, Trial Exh. 28; Assignment of Rents, Trial Exh. 29; Prepayment Rider,

Trial Exh. 30; attached collectively as Appellee's ER, Tab 41) and Shelton

presented Scapa with a false corporate resolution signed by her as secretary which

stated that the Club had authorized the borrowing, when, in fact, the Club's board

had not.  (Resolution to Borrow Capital, Trial Exh. 18, Appellee's ER, Tab 42;

Notice of Depo. Test. of Jennifer Morgan Taken June 30, 2016, and July 1, 2016,

Appellee's ER, Tab 43, p. 2024 (Abstained); Notice of Depo. Test. of Alda J.

Shelton Taken June 29, 2016, Appellee's ER, Tab 44, pp. 2117, 2166 (Abstained);

Resp. of Michael Wallace to Trustee's Req. for Admissions Set No. 1, Trial Exh.

154, Appellee's ER, Tab 45, pp. 2199 (denied voting in favor of "alleged"

resolution), 2200 (denied voting in favor of "alleged" resolution), and 2201 (does

not recall how he voted on the "actual" resolution); Trial Decl. of Michael Wallace,

Docket No. 401, Appellee's ER, Tab 46, p. 2220 (makes no mention of vote); Tr.

of Proceedings (Feb. 16, 2017), Appellee's ER, Tab 47, p. 2423:11-17 (Wallace did

not include any statements to support a finding on how voted); Notice of Depo.

Testimony of Sherita Herring, Docket No. 377, Appellee's ER, Tab 32, pp. 1559,

1562-63 (denies knowledge or voting on it), and 1535 (no discussions to borrow

money or regarding Scapa Loan); Tr. of Proceedings (Feb. 16, 2017), Appellee's

ER, Tab 47, pp. 2371:19-21 (Herring denies voting on Scapa Loan), 2372:9-11

(denies witnessing vote), 2381:5-12 (became inactive on the Board starting in

April 2011); Trial Decl. of Ian Duncan, Docket No. 356, Appellee's ER, Tab 34, p.

1845 (denies voting to approve and had no knowledge Board considered loan)).  In

fact, not only did the members of the board not approve the Scapa Loan, many did

not even know about it.  (Not. of Depo. Testimony of Sherita Herring Taken on

June 29, 2016, Docket No. 377, Appellee's ER, Tab 32, 1559, 1562-63 (denies

knowledge or voting on it), and 1535 (no discussions to borrow money or

regarding Scapa Loan); Trial Decl. of Ian Duncan, Docket No. 356, Appellee's ER,

Tab 34, p. 1845 (no knowledge Board considered loan); Trial Decl. of Lorraine

Genovese, Docket No. 357, Appellee's ER, Tab 16, p. 754:11-12 (denies knowing

Morgan was paid from the Scapa Proceeds), p. 755:25-27 (had resigned and had no

knowledge of Scapa Loan)).  The Scapa Loan contained a 12% interest rate and a

maturity date of five years.  (Promissory Note Secured by Scapa Deed of Trust,

Trial Exh. 26, Appellee's ER, Tab 48)  The Scapa Loan was secured by a deed of

trust against the Property.  (Trial Exh. 28, Appellee's ER, Tab 40.)  From escrow,

over 54% of the loan proceeds (or $377,712.33) was immediately disbursed to

Morgan, Shelton, and Van Tassell's spouse, Von Randallhoff, as follows: (1)

$157,500.00 was paid to Von Randallhoff, Van Tassell's husband; (2) $120,212.33

was paid to Morgan; and (3) $100,000.00 was paid to Shelton.  (File Ledger

showing disbursements, Trial Exh. 32, Appellee's ER, Tab 49; Scapa Loan Final

Settlement Statement, Trial Exh. 31, Appellee's ER, Tab 50).  The payment to Von

Randallhoff, Van Tassell's spouse, included a pre-payment penalty of $7,500.00

because the obligation was not yet due.  (Beneficiary Demand Letter, Trial Exh.

15, Appellee's ER, Tab 51).  In addition, the Scapa Loan proceeds paid $45,379 in

loan fees and costs.  (File Ledger showing disbursements, Trial Exh. 32, Appellee's

ER, Tab 49; Scapa Loan Final Settlement Statement, Trial Exh. 31, Appellee's ER,

Tab 50).  Escrow also paid property taxes of $13,387.98.  (*Id.*)

After the Scapa Loan closed, the monthly interest payments due on the

Scapa Loan were paid for by the Scapa Loan proceeds and, over time, a total of

$49,700 was paid to Scapa, which represented seven monthly interest payments.

(Tr. of Proceedings (Mar. 8, 2017), Appellee's ER, Tab 52, p. 2766:20-22 and p.

2767:17-21).

Between the amounts paid to insiders (Morgan, Shelton and Van Tassell's

spouse) and the amounts paid to obtain and service the high-interest, high-cost

Scapa Loan, including $45,379 in closing costs and loan fees, and $49,700 used to

pay Scapa seven monthly interest payments, the Club received, at most,

$200,428.30, exclusive of the property taxes paid, or $213,816.30, inclusive of the

property taxes paid.  (File Ledger showing disbursements, Trial Exh. 32,

Appellee's ER, Tab 49; Scapa Loan Final Settlement Statement, Trial Exh. 31,

Appellee's ER, Tab 50; Tr. of Proceedings (Mar. 8, 2017), Appellee's ER, Tab 52,

p. 2767:17-24).  In sum, the Club received only approximately 30% of the Scapa

Loan proceeds.

Morgan knew or should have known that the Club could not afford the

Scapa Loan.  (Disclosure Statement, Trial Exh. 209, Appellee's ER, Tab 53 at

2900:9-12; Tr. of Proceedings (Feb. 17, 2017), Appellee's ER, Tab 76 at 4085:3-

10). The Club had minimal revenues and had operated at a loss from 2009 on.  (FY

2008-09 Tax Return, Trial Exh. 269, Appellee's ER, Tab 10; FY 2009-10 Tax

Return, Trial Exh. 270, Appellee's ER, Tab 11; FY 2010-11 Tax Return, Trial Exh.

318, Appellee's ER, Tab 54; Club's Income Statements for the months of March

and April 2012, Trial Exh. 176, Appellee's ER, Tab 55, pp. 2965-2968; Statement

of Financial Affairs, Trial Exh. 219, Appellee's ER, Tab 56).  The Club's tax

returns for 2009 and 2010 reflect that the Club operated at a loss in both of those

years.  According to the Club's profit and loss statement, the operating losses

continued in 2010, and the Club's balance sheet reflected cash of only $619.25.

(Trial Exh. 209, Appellee's ER, Tab 53, p. 2938).

The Club's financial situation did not improve in 2011.  Rather, the operating

losses continued.  The Club's profit and loss statement for the first two months of

2011 reflected a loss of almost $30,000.  (*Id.* at p. 2937).  The Club's bankruptcy

schedules, filed in February 2011, reflected that the Club was not paying its debts

as they became due.  The Club owed property taxes of $8,065.99 and

approximately $43,551 to seven general unsecured creditors.  (Trial Exh. 207, Appellee's ER, Tab 23).  The Club's disclosure statement, filed March 28, 2011 and signed by Morgan as treasurer, admitted the Club's gross monthly rental revenues were only $9,000 per month.  (Trial Exh. 209, Appellee's ER, Tab 53, p. 2900).  In comparison, the Scapa monthly debt service alone was $7,000.  Thus, even before Morgan and Shelton caused the Club to obtain a $700,000 loan with interest at 12%, the Club was not operating profitably and consistently operated at a loss in 2009, 2010, and 2011.

       7.     <u>The Club's Second Voluntary Bankruptcy Case</u>

In early 2012, the Club was faced with the appointment of another receiver. (Trial Decl. of Dennis W. Rook, Appellee's ER, Tab 57, p. 2981, ¶ 1.) Again, to maintain control of the Club and its valuable Property, Morgan, as the Club's executive director, and Shelton, as the Club's attorney, filed a voluntary chapter 11 bankruptcy petition.  (Trial Exh. 217, Appellee's ER, Tab 58).  On April 20, 2012, upon motion filed by the Quick Plaintiffs, the bankruptcy court dismissed the Club's second bankruptcy case with a prohibition against refiling another bankruptcy case for 175 days.  (Docket Report for second voluntary bankruptcy, Trial Exh. 223, Appellee's ER, Tab 59, p. 3012).

       8.     <u>The Club's Third Voluntary Bankruptcy Case</u>

After Morgan and Shelton exhausted the proceeds of the Scapa Loan and

caused the Club to stop making monthly interest payments to Scapa, which was not surprising considering the Club's dismal finances at and after the Scapa Loan was incurred, Scapa scheduled a foreclosure sale.  (Tr. of 341(a) Meeting of Creditors (Jan. 28, 2013), Trial Exh. 197, Appellee's ER, Tab 60, p. 3022:5-6).  In order to stay the sale, on December 13, 2012, Morgan, as CEO, and again with Shelton as counsel, caused the Club to file its third voluntary bankruptcy case – the instant Bankruptcy Case.  (*Id*. ("The bankruptcy was filed because there was a pending foreclosure on December 14th"); Dec. 2012 Petition and Statement of Financial Affairs, Trial Exh. 225, Appellee's ER, Tab 13; Amended Petition, Trial Exh. 227, Appellee's ER, Tab 61; Tr. of 341(a) Meeting of Creditors (Jan. 28, 2013), Trial Exh. 197, Appellee's ER, Tab 60, p. 3021:5-11).  Because the bankruptcy court was concerned about the Club's management with Morgan and Shelton at its helm, it authorized the appointment of a chapter 11 trustee and the Trustee was subsequently appointed.  (Order Appointing Trustee, Appellee's ER, Tab 62; Tr. of Proceedings (Jan. 16, 2013) at 1822, Appellee's ER, Tab 75 p. 3896-3898).

## VI.   THE ADVERSARY PROCEEDING

After the Trustee investigated the events that occurred, the Trustee filed a complaint against various officers and board members of the Club.  (Appellee's ER, Tab 63.)  The complaint was later amended.  (First Amended Complaint,

Appellant's App. Exh. 1).

## VII.   EXPERT TESTIMONY REGARDING DAMAGES

In order to assist the Trustee with proving the amount of damages caused by Morgan's and Shelton's breach of fiduciary duty, the Trustee retained Donald Fife, a certified public accountant, as her expert.  Mr. Fife prepared his expert report and the Trustee timely disclosed the report to the defendants.  In order to comply with the Federal Rules of Civil Procedure, Mr. Fife's report either attached documents or specifically identified documents on which he relied.  (Em. Mot. for Reconsideration, Appellee's ER, Tab 65; Omnibus Opp. to Mot. in Limine to Exclude the Testimony of Expert Don Fife (the "Omnibus Fife Opposition") and the Declaration of Autumn D. Spaeth in support thereof, Appellee's ER, Tab 66). Mr. Fife's report identified seventeen specific documents and one category of documents consisting of the Club's bank statements for five different accounts as documents on which he relied in formulating his opinion.  (*Id.*)  Although not all of the documents were physically attached to the report, the majority of them were. For instance, the report attached (1) the relevant portions of the Club's Form 990s for the six years in question, (2) relevant portions of the Club's schedules, (3) the final settlement statement for the Scapa Loan, (4) the EL Electric invoice, and (5) excerpts from the bank statements.  (*Id.*)  Thus, of the seventeen documents and

one category listed, ten of the documents were attached in whole or in part and the

remainder were either pleadings served on the Defendants (i.e., the fee

applications) or documents that the Trustee obtained from Ms. Shelton and the

other Defendants during discovery.  (Reply to Opp. to Emergency Mot. for

Reconsideration, Appellee's ER, Tab 67, at 3443-45; Omnibus Fife Opposition,

Appellee's ER, Tab 66, p. 3438-39).  At the final pre-trial conference in November

2016, Shelton asked the bankruptcy court for permission to take Mr. Fife's

deposition after the discovery cutoff date of June 30, 2016, and the bankruptcy

court authorized her to do so.  Mr. Fife's deposition was thereafter taken.  At that

hearing, no party requested the bankruptcy court's authorization to seek additional

documents from the Trustee or Mr. Fife.  (Reply to Opp. to Emergency Mot. for

Reconsideration, Appellee's ER, Tab 67).

　　　Prior to trial, Michael Wallace, who was represented by Shelton as his

counsel, filed a motion in limine to exclude Mr. Fife's testimony, alleging that the

report did not comply with Federal Rule of Civil Procedure 26(a)(2)(B) because

although the report identified all of the exhibits on which Mr. Fife used to

summarize or support his opinions, it did not physically attach all of them.  Mr.

Wallace also contended that Mr. Fife's trial declaration contained a number of new

opinions that had not been contained in his expert report.  (Mot. in Limine of

Michael Wallace to Exclude the Testimony of Expert Don Fife, Appellee's ER,

Tab 68).  Shelton, as one of the co-defendants, joined in the motion that she

prepared as Mr. Wallace's counsel.  (Defendant Alda Shelton's Not. of Joinder with

Mot. in Limine of Michael Wallace, Appellee's ER, Tab 69).  Morgan was not a

party to the motion in limine.  (Relevant portions of Docket Report of Case No.

2:13-ap-01854-BR, Appellee's ER, Tab 70).  The Trustee opposed the motion,

arguing that the Trustee had complied with the rule by disclosing all of the exhibits

and attaching the majority of them and that, in any event, the Defendants had

suffered no prejudice because to the extent the documents were not attached, they

had them in their possession and, in some instances, had even been the ones to

produce them to the Trustee.  (Omnibus Fife Opposition, Appellee's ER, Tab 66).

The Trustee also denied that there were new opinions in Mr. Fife's declaration and

argued that the declaration was not required to be identical to the report and that it

was permissible to include supplemental information.  (*Id.*)  In their reply, Mr.

Wallace and Shelton raised evidentiary objections to the declaration of Ms. Spaeth

that was attached to the opposition.  (Objections to Decl. of Autumn Spaeth

attached to the Reply of Michael Wallace to Kurtz's Omnibus Opp. to Mot. to

Exclude the Testimony of Heide Kurtz's Expert Don Fife, Appellee's ER, Tab 71).

At the first day of trial, the bankruptcy court agreed with the defendants, sustained

the evidentiary objections to Ms. Spaeth's declaration, and granted the motion.  (Tr.

of Proceedings (Feb. 15, 2017), Appellee's ER, Tab 33, p. 1599:17-21).

Surprised by the bankruptcy court's ruling, the Trustee filed an emergency motion for reconsideration of the ruling, arguing that the Court's ruling was inconsistent with the facts and the law and explaining more thoroughly how the paragraphs of Mr. Fife's declaration that the Defendants argued contained new opinion were in fact either not new opinions and were offered as rebuttal testimony.  (Emergency Mot. for Reconsideration of Oral Ruling, Appellee's ER, Tab 65).  The defendants opposed the motion.  When the bankruptcy court eventually held a hearing on the motion for reconsideration after closing trial testimony, it denied the request for reconsideration, finding that it was an improper motion for reconsideration because it relied upon portions of Ms. Spaeth's declaration that had been stricken.  The bankruptcy court also noted that it did not find Mr. Fife's declaration to be particularly helpful in any case because the Trustee had all of the numbers for damages.  (Tr. of Proceedings (May 17, 2017), Appellee's ER, Tab 72, at 3676:19-3678:13.)  As a result, the bankruptcy court did not allow Mr. Fife's testimony on damages.

## VIII.  <u>THE TRIAL</u>

After five days of testimony, the bankruptcy court held a post-trial hearing on May 17, 2017, during which it announced its rulings and findings.  (Tr. of Proceedings (May 17, 2017), Appellee's ER, Tab 72).  The bankruptcy court found

that there was no board approval for the Scapa Loan.  (*Id*. at p. 3708:15-20; p.

3709:3-7; p. 3718:9-11).  The bankruptcy court also found that there was no legal

basis for the $120,016.73 that was disbursed from the Scapa Loan proceeds to

Morgan.  (*Id*. at p. 3712:5-20).  Although the bankruptcy court relied on testimony

to conclude that there was no board approval for the Scapa Loan or the Morgan

Deed of Trust, it inexplicably did not use this same testimony to make any findings

regarding the lack of board approval for the Second Von Randallhoff Deed of

Trust, the Third Von Randallhoff Deed of Trust, and the $100,000 paid to Shelton

for an alleged retainer.  Each of these obligations was ultimately satisfied and paid

with the proceeds of the Scapa Loan, which the bankruptcy court found was never

authorized by the Club's board.  (File Ledger showing disbursements, Trial Exh.

32, Appellee's ER, Tab 49; Scapa Loan Final Settlement Statement, Trial Exh. 31,

Appellee's ER, Tab 50; Appellee's ER, Tab 72 at pp. 3708:15-20, 3709:3-7, and

3718:9-11).

Focusing solely on what Morgan received, the bankruptcy court awarded

damages against Morgan of $160,903.48, consisting of (1) $6,400.00 that she

retained without authorization after the Club's third bankruptcy filing, (2)

$25,000.00 that Jae Kim refunded to her from the Third Von Randallhoff Loan,

and $120,016.73 that she received directly from escrow from the proceeds of the

Scapa Loan.  (Judg. in Favor of Plaintiff Trustee and Against Def. Jennifer Morgan

on Plaintiff's First Am. Compl., Appellee's ER, Tab 1).  Despite finding that Shelton had breached her fiduciary duty, the bankruptcy court found that there were no damages, so entered judgment in favor of Shelton.  (Tr. of Proceedings (May 17, 2017), Appellee's ER, Tab 72, at 3718:9-3719:24).

## IX.   ARGUMENT

### A.   The Bankruptcy Court Did Not Err in Finding Morgan Liable for Breach of Fiduciary Duty

1.   Morgan Breached Her Fiduciary Duties to the Club and Caused the Club to Incur an Unauthorized Secured Hard Money Loan that She Knew or Should Have Known that the Club Could Not Repay and that Was for the Benefit of Herself and Other Insiders of the Club

The Club is a California corporation.  California law governs the issue of whether directors of a not-for-profit corporation incorporated in California breached their fiduciary duty.  *See In re Verisign, Inc., Deriv. Litig.*, 531 F.Supp.2d 1173, 1215-15 (N.D. Cal. 2007); Cal. Corp. Code § 2116.  In California, the elements of a claim for breach of fiduciary duty are the existence of a fiduciary relationship, a breach of that fiduciary duty, and damage proximately caused by the breach.  *See City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Al. App. 445, 483 (1998).  Officers and directors of a corporation are a fiduciary of the corporation and owe the corporation the duties of good faith and fair dealing and the duty of loyalty.  *See Frances T. v. Village Green Owners Ass'n*, 42 Cal. 3d 490, 513 (1986).  Directors must act in a manner that they believe to be in the best

interest of a corporation.  The duty of loyalty includes a duty to avoid conflicts of interest between the directors individually and the corporation.  *See* Cal. Corp. Code § 5231(a) (providing that "[a] director shall perform the duties of a director . . . in good faith, in a manner that director believes to be in the best interests of the corporation and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.").  Directors also owe the corporation a duty of obedience, which requires that the director ensure "that a corporation keeps within its corporate powers and obeys the laws." *Professional Hockey Corp. v. World Hockey Ass'n*, 143 Cal. App. 3d 410, 414 (1983).

> (a)  As a Director and Officer of the Club, Morgan Owed Fiduciary Duties to the Club

It is undisputed that Morgan became an officer and director of the Club by no later than February 2010 and that she continued to act in these capacities through at least 2013.

> (b)  Morgan Breached her Fiduciary Duties to the Club

In California, directors and officers of a corporation owe the corporation a fiduciary duty, which includes the duties of obedience, diligence and loyalty.  *See Professional Hockey Corp. v. World Hockey Ass'n*, 143 Cal. App. 3d 410, 414 (1983).  "In performance of their official duties directors are under obligations of trust and confidence to the corporation . . . .  Directors must act in good faith for

the interests of the corporation … with due care and diligence and within the bounds of their authority." *Id.* Under California law, the duty of loyalty requires the directors/trustees not to act in their own self-interest when the interest of their corporation will be damaged thereby." *Id.*

"The duty of obedience requires directors to act within the scope of the charter, bylaws, and other corporate governing documents and to obey all laws and regulations that apply to the corporation's business." Law of Corp. Officers & Dir.: Indemn. & Ins. § 1:36; *see also In re Dalen*, 259 B.R. 586, 610 (Bankr. W.D. Mich. 2001) ("Fiduciaries owe three basic duties to their constituents: the duty of care (i.e., the obligation not to act negligently), the duty of loyalty (i.e., the obligation not to act in the fiduciary's own interests), and the duty of obedience (i.e., the obligation not to act outside the fiduciary's permitted authority)."); *Professional Hockey Corp. v. World Hockey Assn.*, 143 Cal.App.3d 410, 414 (1983) ("Furthermore, Delaware law adopts, as has California, the concept of the directors and/or trustees fiduciary duty, including the duties of obedience, diligence and loyalty. Directors owe such duty in the management of corporate affairs. In performance of their official duties, directors are under obligations of trust and confidence to the corporation and its stockholders. Directors must act in good faith for the interests of the corporation or its stockholders with due care and diligence and within the bounds of their authority. It is the duty of the director to

see that a corporation keeps within its corporate powers and obeys the laws.")
(internal citations omitted).

"[T]he business and affairs of the corporation shall be managed and all
corporate powers shall be exercised by or under the direction of the board . . . ."
Cal. Corp. Code § 300(a).  "Thus, all matters involving the 'business and affairs' of
the corporation are subject to ultimate direction by its board of directors.  And,
whenever corporate action is required, it means action by, or under the authority
of, the board."  Friedman, Fotenos and Rybka, Cal. Practice Guide: *Corporations* 6
(The Rutter Group 2017) ¶ 6:173 (emphasis in original).  Specific board action is
required for any action not in the ordinary course of business, including corporate
borrowing.  *Id.* at ¶¶ 6:174, 6:471 and 6:484, citing Cal. Corp. Code § 207(g).

Here, the bankruptcy court correctly concluded that there was no board
authorization for the Morgan Deed of Trust.  (Tr. of Proceedings (May 17, 2017),
Appellee's ER, Tab 72,p. 3712).  The bankruptcy court also correctly concluded
that there was no board authorization for the Scapa Loan, an act that requires
specific board action under California law.  (Tr. of Proceedings (May 17, 2017),
Appellee's ER, Tab 72, p. 3718:9-11).  Moreover, there is no dispute that the Club
could not afford the Scapa Loan.  Both Morgan and Shelton were well aware of
this.  The Club's disclosure statement filed in March 2011 and signed by Morgan as
treasurer admitted that the Club's monthly revenue was only $9,000 a month.

(Disclosure Statement (Mar. 28, 2011) at 2900, Appellee's ER, Tab 53).  The
monthly payment for just the Scapa Loan was $7,000, which was almost the
entirety of the Club's monthly gross income.  The profit and loss statements
attached to that disclosure statement reflect that the Club's net income for the
calendar year 2010 was negative $21,099.63 and that for the first two months of
2011 was negative $30,042.74.  (*Id.* at 2935, 2937).  The Club could not afford to
make the monthly payments out of the Club's operating income and the few
payments that were made were paid by the proceeds of the Scapa Loan.  Indeed,
Morgan and Shelton intentionally borrowed more money from Scapa in order to
use the loan proceeds to make the first year's loan payments.  (Tr. of Proceedings
(Mar. 8, 2017), Appellee's ER, Tab 52, p. 2799:25-2800:4; Trial Decl. of Jennifer
Morgan, Appellee's ER, Tab 14, p. 656:1-3).  Once the proceeds of the Scapa Loan
were exhausted, the Club was left unable to make the monthly loan payments and
was forced to file the instant Bankruptcy Case in order to stay the foreclosure sale.
(*See* Decl. of Jennifer Morgan filed 01/02/13, Trial Exh. 169, Appellee's ER, Tab
73, pp. 3729-30).

Morgan knew that the Scapa Loan would need to immediately be replaced
with a less expensive loan if the Club was to avoid filing for bankruptcy.  (Trial
Decl. of Jennifer Morgan at pp. 655-656, ¶ 93, Appellee's ER, Tab 14; Tr. of
Proceedings (Mar. 8, 2017) at 2799:24-2800:2, Appellee's ER, Tab 52; Trial Decl.

of Michael Wallace at p. 2220, ¶ 24, Appellee's ER, Tab 46).  However, there was

no reason to believe that this was realistic.  According to Morgan, the Club was

repeatedly turned down for a more conventional (and hence, less expensive) loan

before it obtained the Scapa Loan.  Morgan repeatedly declared under oath that as

soon as she disclosed the existence of the Quick Action to regular commercial

lenders, they declined to lend to the Club.  (Decl. of Jennifer Morgan at pp. 3727-

3728, ¶ 10, Appellee's ER at 73; Tr. of Proceedings (Mar. 8, 2017) at 2756:19-

2757:4, Appellee's ER at 52).

Given the weight of this evidence and the testimony of both Morgan and

Shelton, the bankruptcy court's finding that Morgan breached her fiduciary duty

was supported by the evidence and should be affirmed.

    2.    <u>The Bankruptcy Court Did Not Err in Finding That There Was No
Contractual Basis for Morgan to Receive a Portion of the Scapa Loan
Proceeds</u>

On appeal, Morgan contends that the bankruptcy court erred in finding that

she did not have a valid employment contract, pointing to cherry-picked

allegations in the Trustee's First Amended Complaint and to exhibits to the

complaint as alleged evidence of a judicial admission by the Trustee that there was

a valid employment contract.  Specifically, Morgan points to an allegation in the

First Amended Complaint in which the Trustee alleged on information and belief

that "in or about July 21. 2010, the Board agreed with Morgan to compensate

Morgan for serving as the Debtor's Executive Director.  The Board agreed to pay

Morgan $300 per week for expenses and to accrue Morgan's 'salary at $8.000 a

month starting August 1, 2010, payable only if money exists' because the Debtor

could not afford to pay Morgan at that time."  First Amended Complaint at ¶ 38,

Appellant's App. at Tab 1.  However, later in the complaint, the Trustee alleged

that at the December 2010 board meeting, they "agreed that Morgan would work

pro bono and would seek compensation once the organization makes a profit."

First Amended Complaint at ¶ 44, Appellant's App. at Tab 1.  The First Amended

Complaint went on to allege that the Trustee was informed that when Morgan

received the Morgan Deed of Trust, "if she was owed anything, Morgan was owed

no more than $41,590 in expenses and compensation at that time, and that the

obligation for Morgan was unsecured."  *Id.* at ¶ 64.  In its findings on the record,

the bankruptcy court concluded as follows:

> . . .the one thing that the testimony is clear, that –
> for me anyway, that there was not a board approval of the
> contract.  The one thing that people were adamant about
> is the board simply could not afford – or at that time,
> there was testimony that at the – at some point, if the club
> was actually able to pay.  When I – to me, that means not
> able because you borrow the money, that's able to pay
> financially, that the money is coming in.
>
> And I do—and so, as far as I am concerned, I –
> there is – I am not satisfied at all that there was ever a
> binding contract to – for the payment of the – of this.
> And, therefore, the money that came out of the
> 120,216.73 was not properly disbursed.

Tr. of Proceedings (May 17, 2017) at 3712:5-18, Appellee's ER at 72.  To

the extent that the First Amended Complaint was inconsistent with the evidence

presented at trial and the Trustee's arguments in connection with trial, the bankruptcy court held that it would permit an amendment to the complaint. *See* Tr. of Proceedings (May 17, 2017) at 3692:4-3693:2, Appellee's ER at 72.  The bankruptcy court committed no error on this issue.

First, the Trustee did not admit that Morgan had a valid employment contract such that the payment to her of alleged accrued salary was also valid.  The allegations in the First Amended Complaint must be read together.  When they are read as a whole, it is apparent that the allegation is that Morgan was not entitled to use any portion of the Scapa Loan proceeds to pay herself because to the extent that any alleged contract had been approved, it was contingent upon the Club operating profitably such that it could afford to make the payments.  The Trustee has never argued that the Club operated profitably so that it should have paid compensation to Morgan.

Second, to be treated as a judicial admission, a statement must:  (1) be made in a judicial proceeding; (2) be deliberate, clear, and unequivocal; concern a fact on which a judgment for the opposing party may be based; (4) conflict with a fact essential to the theory of recovery; and (5) be such that giving it conclusive effect meets with public policy.  *See Heritage Bank v. Redcom Labs., Inc.*, 250 F.3d 319, 329 (5th Cir. 2001).  Here, the allegation Morgan relies on in isolation was not made based on personal knowledge, but was instead made on information and

belief.  In addition, it does not concern a fact on which a judgment for Morgan can
be based, because the allegation itself provides that the compensation could only
be paid once funds became available and, in the context of other allegations in the
First Amended Complaint, that meant that the Club had to operate profitably.  Last,
to the extent that the evidence at trial proved that there had not, in fact, been proper
board approval for any employment contract, the Trustee, who pled on information
and belief, was laboring under a mistake when the allegation was contained in the
First Amended Complaint and, to the extent necessary, may be relieved of any
admission.  *See New Amsterdam Cas. Co. v. Waller*, 323 F.3d 20, 24 (4th Cir.
1963).

Further, even if there was a valid employment contract that required
Morgan's payment, it does not change the analysis of whether obtaining the Scapa
Loan was a breach of fiduciary duty.  The Scapa Loan was never authorized by the
Club's board and the amount of the Scapa Loan far exceeded any amount Morgan
was allegedly owed for compensation and contained terms that were unfavorable to
the Club and repayment terms that the Club clearly could not afford.

**B.**     **The Bankruptcy Court Erred in Calculating the Amount of Damages
for Morgan's Breach of Fiduciary Duty**

      1.     <u>The Bankruptcy Court Erroneously Focused Its Analysis on the
Amount Morgan Received as a Result of Her Fiduciary Duty and Not
on the Amount of Damage Her Breach Caused the Club</u>

"'Damages' are monetary compensation awarded to parties who suffer

detriment for the unlawful act or omission of another; they are assessed by a court against wrongdoers for the commission of a legal wrong of a private nature. . . . The focus of an award of damages is the quantification of detriment suffered by a party." *Meister v. Mensinger*, 230 Cal. App. 4th 381, 396 (2014)(citations omitted). "'Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty.  The law requires only that some reasonable computation of damages be used, and the damages may be computed even if the result reached is an approximation.'"  *Id.* (quoting *GHK Assocs. v. Mayer Group, Inc.*, 224 Cal. App. 3d 856, 873-74 (1990))(alteration in original).

Here, there is no question that by causing the Club to give herself the Morgan Deed of Trust and to obtain the unauthorized Scapa Loan, Morgan caused harm to the Club.  The undisputed evidence is that the Club could not afford to pay Morgan (Tr. of Proceedings (Day 5, Shelton testimony) at 134:14-15, Appellee's ER at Tab 30; Trial Decl. of Lorraine Genovese at 4:5-6, Appellee's ER at Tab 16) or the Scapa Loan.  (FY 2008-09 Tax Return, Trial Exh. 269, Appellee's ER, Tab 10;  FY 2009-10 Tax Return, Trial Exh. 270, Appellee's ER, Tab 11;  FY 2010-11 Tax Return, Trial Exh. 318, Appellee's ER, Tab 54; Club's Income Statements for the months of March and April 2012, Trial Exh. 176, Appellee's ER, Tab 55, pp. 2965-68; Statement of Financial Affairs, Trial Exh. 219, Appellee's ER, Tab 56). In fact, extra money was borrowed from Scapa so that the Scapa Loan could be

serviced with the loan proceeds.  (Tr. of Proceedings (Mar. 8, 2017), Appellee's

ER, Tab 52, pp. 2799:25-2800:4; Appellee's ER, Tab 14, Tr. of Proceedings (Feb.

17, 2017), Appellee's ER, Tab 76 at 4085:3-10; Tr. of Proceedings (Mar. 8, 2017),

Appellee's ER, Tab 52, p. 2580:10-2581:4, 2627:19-2628:16.)  Once the Scapa

Loan proceeds were exhausted, the Club was left unable to make the monthly loan

payments and was forced to file the Bankruptcy Case to stop Scapa's foreclosure

sale and protect the Property.   (*See* Decl. of Jennifer Morgan filed 01/02/13, Trial

Exh. 169, Appellee's ER, Tab 73, pp. 3729-30.)

  The bankruptcy court eventually approved a chapter 11 plan that allowed the

Club to exit the bankruptcy and maintain its ownership of the Property.  (Plan of

Reorganization, Appellee's ER, Tab 4; Order Confirming Plan, Appellee's ER, Tab

3.)  However, the Club's ability to retain the Property came at a price - the

bankruptcy court's approved plan requires the Club to repay $1,616,886.96 to

Scapa.  (Plan of Reorganization, Appellee's ER, Tab 4, p. 151.)  The Trustee

asserts that this is the amount of damages suffered by the Club as a result of

Morgan's actions in breaching her fiduciary duties, granting herself an

unauthorized deed of trust and obtaining the unauthorized Scapa Loan.  Therefore,

it is this amount that should have been awarded by the bankruptcy court.

  In determining the amount of damages in its judgment against Morgan, the

bankruptcy court simply added up the actual amounts received by Morgan rather

than the amount of harm suffered by the Club as a result of the unauthorized and excessive Scapa Loan.  (Appellee's ER, Tab 1.)  It made a similar error when it declined to award damages against Shelton for money received by other people.

These errors resulted from the bankruptcy court's incorrect application of the law on damages and should be reversed.  The focus of an award of damages is the quantification of detriment suffered by a party.  *See Meister*, 230 Cal. App. at 396.  Here, the Scapa Loan was unauthorized and unaffordable, which led to a predictable default and a scheduled foreclosure sale.  The Club, led by Morgan and Shelton, as board members and officers, filed the Bankruptcy Case to stop the foreclosure sale.  However, the automatic stay is not indefinite and to save its valuable Property from an eventual foreclosure sale by Scapa, the Club is required, pursuant to the bankruptcy court's confirmed plan, to repay Scapa in excess of $1.6 million.  This amount is the direct and proximate harm suffered by the Club as a result of Morgan's breach.  The amount that Morgan received from the proceeds of the Scapa Loan is irrelevant to a proper calculation of damages.  Morgan contends in her brief that the Judgment should be reduced because she returned $20,000 of the $120,016.73 she received from the Scapa Loan proceeds.  Because the calculation of damages for Morgan's breach is the harm that the Club suffered, and not the amount she actually received, this issue is of no import.

Although the bankruptcy court correctly concluded that Morgan breached

her fiduciary duty, it erred in its calculation of damages and that portion of the

judgment should be reversed and remanded with instructions to enter a judgment in

the amount of no less than $1,616,886.96.

   2.   The Bankruptcy Court Abused Its Discretion in Striking the Trial
        Declaration of Trustee's Expert Witness Don T. Fife, CPA and
        Excluding the Trial Testimony of Don T. Fife, CPA

In this case, in light of the bankruptcy court's erroneous application of

damages, Mr. Fife's testimony on damages could have aided the bankruptcy court

in reaching the correct outcome.  The bankruptcy court's ruling in striking the

entirety of Mr. Fife's testimony was an abuse of discretion.

Federal Rule of Civil Procedure 26(a)(2)(B) requires that an expert report

contain, among other things, "(i) a complete statement of all opinions the witness

will express and the basis and reasons for them; (ii) the facts or data considered by

the witness in forming them; [and] (iii) any exhibits that will be used to summarize

or support them."  The rule is not clear that the exhibits must be physically

attached to the report as opposed to specifically identified.  Moreover, the point of

Rule 26 is disclosure.  The legislative history to this rule indicates that the expert

report is to "disclose" the exhibits that support the expert's opinions.  See Fed. R.

Civ. P. 26, Adv. Comm. Notes ("The report is to disclose the data and other

information considered by the expert and any exhibits or charts that summarize or

support the expert's opinions.").  In *Zone Sports Ctr., LLC v. Nat'l Sur. Corp.*, 2012

WL 1969048 (E.D. Cal. May 31, 2012), the defendant argued that the plaintiffs

failed to provide all of the documents relied upon by their expert at the time of the

expert's disclosure.  *Id.* at \*4.  The plaintiffs responded that all of the documents

referenced by their expert were produced either "in their initial disclosures,

concurrently with the expert report, or subsequently thereto . . . ."  *Id.*  The court

found that the plaintiffs met their obligation under Rule 26(a)(2)(B) because

between plaintiffs' initial disclosures, the exhibits attached to the expert report, and

the documents the defendants obtained from a third party, the defendant "was in

possession of all the documents" referenced in the expert's report.

   Where there is a failure to comply with the requirements of Rule 26, courts

generally require egregious conduct before striking testimony.  For example, in

*Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101 (9th Cir. 2001), the

defendants timely identified a damages expert but then failed to provide his expert

report for more than two years, and only 28 days before trial.  The plaintiff was

unable to depose the expert or to prepare to question him at trial.  *Id.* at 1106-07.

Therefore, the Ninth Circuit affirmed the district court's decision to exclude his

testimony.  Similarly, in *United States v. Chapman Univ.*, 245 F.R.D. 652 (C.D.

Cal. 2007), on the deadline for initial disclosures of experts, the plaintiff sent the

defendants its expert's resume and a two-page letter from the expert setting forth

ten issues about which he had been retained to testify.  The letter contained no

opinions and it was evident that he had, in fact, not yet formed any opinions.  *Id.* at 652.  Three weeks later, the expert provided his report.  The court found that the insufficient disclosure was not negligent but was instead part of the party's trial strategy.  *Id.* at 654.  The court found that this was not harmless, because it substantially prejudiced the defendant's trial preparation because it did not have time to analyze the expert report or to find a rebuttal witness before the deadline for disclosure of rebuttal experts and in time to timely prepare a motion in limine. *Id.*

Here, the first error in connection with the bankruptcy court's granting of the motion in limine to exclude Mr. Fife's testimony was in striking all of the portions of Ms. Spaeth's declaration to which there was an objection.  In her declaration, Ms. Spaeth testified that she represented the Trustee and then went through a number of the documents identified in Mr. Fife's report in the section on "Sources Considered in Rendering of Opinions."  The defendants objected to most of this testimony on the basis that it was irrelevant, lacked foundation, or for substantive, non-evidentiary reasons (i.e., they were not required to hunt public records to find documents).  Without explanation, the bankruptcy court stated that it was sustaining all of the objections.  This was erroneous.  The testimony was not irrelevant since the point of Federal Rule of Civil Procedure is to provide a party who has been prejudiced with a remedy.  The point here is that the defendants were

in no way prejudiced by the fact that some of the documents on which Mr. Fife relied were not physically attached to the report.

The bankruptcy court's second error was in finding that the motion for reconsideration was simply improper.  Where a court commits clear error or the original decision was manifestly unjust, a motion for reconsideration may be utilized.  *See School Dist. No. 1J, Multnomah County, Oregon v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).  Precluding the testimony of an expert in its entirety is a drastic remedy that is appropriately applied where "the party's conduct represents flagrant bad faith and callous disregard of the federal rules." *McNerney v. Archer Daniels Midland Co.*, 164 F.R.D. 584, 586 (W.D.N.Y. 1995).  There was no flagrant bad faith disregard of the rules in this case and, for the reasons set forth below, the bankruptcy court's decision was manifestly unjust to the Trustee because it resulted in the striking of a significant portion of the Trustee's evidence on damages.

The bankruptcy court's third error was in finding that the documents on which Mr. Fife relied were required to be physically affixed to the report and that because they were not, the Trustee and Mr. Fife had failed to comply with Rule 26 and the appropriate remedy was the striking of all of Mr. Fife's testimony.  The point of Rule 26 is to ensure there is proper disclosure.  The physical attachment of the documents is not necessary to ensuring that the disclosure objective of Rule 26

is met.  *See Zone Sports Ctr., LLC v. Nat'l Sur. Corp.*, 2012 WL 1969048 (E.D. Cal. May 31, 2012).

However, even if one were to interpret Rule 26 to mean that the exhibits on which Mr. Fife relied were required to be physically attached to the expert report instead of disclosed in it, this mistake was substantially justified and, therefore, the Court's ruling was erroneous.  Federal Rule of Civil Procedure 37 provides that "[i]f a party fails to provide information . . . as required by Rule 26(a), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1).  In determining whether an error was substantially justified, courts have considered the following factors: "(1) the importance of the excluded testimony; (2) the explanation of the party for its failure to comply with the required disclosure; (3) the potential prejudice that would arise from allowing the testimony; and (4) the availability of a continuance to cure the prejudice." *Sullivan v. Glock, Inc.*, 175 F.R.D. 497, 506-07 (Fed. Cir. 1997).  Here, in light of the bankruptcy court's erroneous conclusion regarding damages, Mr. Fife's testimony clearly would have been important to a proper calculation of damages. Second, any error was caused by interpreting Rule 26's requirement that exhibits be contained in the report as permitting that documents on which the expert relied be plainly disclosed but not necessarily physically affixed to the report.  Third, and as

set forth below, there is no prejudice to the defendants because they were plainly informed which documents were relied upon and had those documents in their possession.  The defendants did not at any point deny that they had the documents, only that they should not be required to go locate them.  There simply was no prejudice here and, as a result, the bankruptcy court abused its discretion in striking all of Mr. Fife's testimony.

Alternatively, even if the bankruptcy court were correct that the expert report failed to comply with the requirements of Rule 26 and that the error was not substantially justified, it erred in striking the entirety of Mr. Fife's testimony instead of just those portions that relied upon the documents that were not physically attached.  As set forth above, a majority of the documents on which Mr. Fife relied were attached to the report, either in whole or in part.  The testimony that relied upon those exhibits should not have been stricken because there was no prejudice at all to the Defendants as to those portions of the report and his declaration.  The striking of testimony is a drastic remedy reserved for egregious conduct, and there was no egregious conduct in this case.

The bankruptcy court abused its discretion in granting defendants' motion in limine and striking the entirety of Mr. Fife's testimony.

3.      <u>Although the Bankruptcy Court Erred in Calculating Damages, It Properly Included the Amounts Morgan Received, Including the $6,400 Payment</u>

The bankruptcy court correctly concluded that Morgan improperly converted the sum of $6,400 representing post-petition rents belonging to the bankruptcy estate.  (Tr. of Proceedings (May 17, 2017), Appellee's ER, Tab 72, at p. 3711:11-14.)  The testimony offered by Morgan was simply not credible.  The bankruptcy court noted that there were "so many inconsistencies in the testimony" and the "testimony there changed dramatically."  (*Id.* at p. 3711, ll. 6-8 and ll. 10-11.)

Morgan's trial testimony as well as her assertions in this appeal are contradicted by multiple prior sworn statements.

At the meeting of creditors on January 28, 2013, held in the underlying bankruptcy case, Morgan was questioned by the Trustee and testified under oath that in December of 2012, she diverted the Club's mail to her home address, as follows:

> Q:      Since that time I found out that you also forwarded the mail and a $6400 check came to the Hollywood Woman's Club, got forwarded to I guess your personal residence, is that correct?
> A:      I had the mail on the 14th of December transferred to my home, which is 2408 Detour Drive (phonetic).  (Exhibit "197," at p. 3030:10-15, Appellee's ER, Tab 60.)

When the Trustee questioned Morgan about the whereabouts of the $6400 rent check from Mosaic, L.A., Morgan testified that she deposited the check into a

newly opened debtor-in-possession account (*Id.* at  p. 3030:16-25, 3031:1-10.) but

then withdrew the funds immediately after depositing the check and spent it as

follows:

> Q:    Where is the $6400?
> A:    I've spent that.
> Q:    Did you have a checking account?  Were you issuing
> checks on the Hollywood Woman's Club?
> A:    No.  I cashed out the money  –
> Q:    So you  –
> A:    – because  –
> Q:    – you were able to cash a check?
> A:    I cashed out the check.  I closed the account and took the
> cash.
> (*Id.* at p. 3033:10-19.)

Morgan further testified that she used the cash taken from the DIP account to

pay personal expenses and court costs.  (*Id.*  at p. 3034:10-3037:23.)  When the

Trustee asked Morgan to return the money to the estate, she refused, saying she did

not have it.  (*Id.* at p. 3037:24-3038:2.)

In September 2013, Morgan again testified under penalty of perjury that she

withdrew the $6400 from the DIP account and spent it, including taking a portion

of the money as part of her "monthly independent-contractor fees."  (Morgan's

declaration in support of the Reply of Debtor, The Woman's Club of Hollywood,

California, to Trustee's and Others' Opposition to Motion to Vacate Trusteeship

and Restore Debtor to DIP Status, filed September 4, 2013, as Docket No. 214, is

attached as Exhibit "175" to the Amended Request for Judicial Notice, Docket No.

440, Appellee's ER, Tab 74 at pp. 3888-89.)

The rent payment of $6400 was property of the Club's bankruptcy estate pursuant to Bankruptcy Code section 541, which provides that "the commencement of a case under section 301, 302, 303 of this title creates an estate.  Such estate is comprised of all the following property, wherever located and by whomever held: … all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541.  Pursuant to Bankruptcy Code section 549, the Trustee may avoid the transfer of property of the estate that occurs after the commencement of the case and is not authorized under by the Bankruptcy Code or by the court.

There is no dispute that the transfer of the rent payment to Morgan was not authorized by the bankruptcy court or by the Bankruptcy Code.  Whether the Club's board authorized or approved the transfer is of no relevance to a determination under section 549.  The bankruptcy court was well within its discretion to find that Morgan's trial testimony on this issue was not credible and to conclude that the Trustee should recover the $6400 post-petition rent payment from Morgan.

4. <u>The Bankruptcy Court Erred in Applying the Federal Interest Rate in Calculating the Prejudgment Interest</u>

The bankruptcy court determined that prejudgment interest was appropriate and applied a simple interest per annum of 1.098%.  (Appellee's ER, Tab 1.)

However, where the underlying claims for relief are based on state law, state law should be used to determine prejudgment interest.

Federal courts addressing the choice of law question often look to the source of a plaintiff's claim when determining the governing law of prejudgment interest: if federal law gives rise to the claim, federal law governs the rule of prejudgment interest to be applied.  Similarly, if state law is the source of the claim then state law supplies the applicable rule of prejudgment interest.  *See In re Keefe*, 401 B.R. 520, 527 (1st Cir. B.A.P. 2009); *Pereira v. Goldberger (In re Stephen Douglas, Ltd.)*, 174 B.R. 16, 22 (Bankr. E.D.N.Y. 1994) (where the judgments are predicated on New York substantive law ... prejudgment interest will be allowed ... at the New York [interest] rate").

In California, interest of 7% per annum is awarded on tort and other non-contractual claims.  *See* Cal. Const., art. 15, sec. 1, and *Children's Hospital and Medical Center v. Bonta*, 118 Cal. Rptr. 2d 629, 775 (Cal. Ct. App. 2002) (interest rate is 7 percent per annum as specified in Cal. Const., art 15, sec. 1, rather than 10 percent, where the action is not based on contract).

Here, the liability is based upon breach of fiduciary duty, a tort claim, to a California corporation.  As such, the bankruptcy court should have applied California's rate of prejudgment interest of 7% and not the federal rate of interest. The bankruptcy court erred as a matter of law in applying the incorrect rate of

interest.

## X.   <u>CONCLUSION</u>

As a board member, executive director, CEO and treasurer, Morgan was a fiduciary to the Club.  She breached her fiduciary duties to the Club in granting herself a deed of trust when it was never authorized by the Club's board and obtaining a high-interest $700,000 secured loan that was never authorized by the Club's board, for her benefit and for the benefit of Shelton, a fellow board member and officer.  With respect to these first two elements of a breach of fiduciary duty cause of action, the bankruptcy court correctly concluded that these elements were met.

The bankruptcy court erred, however, when it failed to apply the correct damages standard and evaluated damages from the perspective of how much Morgan received, rather than the harm suffered by the Club.  As a result of Morgan's breaches, the Club was saddled with an unauthorized secured hard money loan that it could not repay and which necessitated the filing of the underlying bankruptcy case in order to stay the lender's foreclosure sale.  Pursuant to the bankruptcy court's confirmed chapter 11 plan, the Club is required to repay in excess of $1.6 million to Scapa, the lender, in order to save its Property and pay off the unauthorized loan.

The bankruptcy court should have entered judgment against Morgan in the amount of $1,616,886.96, plus the additional amounts she received not attributable to the Scapa Loan.  It erred in its failure to do so and the judgment should be reversed with instructions to the bankruptcy court to enter a judgment for at least $1,616,886.96, plus the additional amounts Morgan received not attributable to the Scapa Loan.  In addition, the bankruptcy court should be instructed to apply the California rate of prejudgment interest.

RESPECTFULLY SUBMITTED this 13th day of October, 2017.


/s/ *Lei Lei Wang Ekvall*
SMILEY WANG-EKVALL, LLP
Lei Lei Wang Ekvall, State Bar No. 163047
Kyra E. Andrassy, State Bar No. 207959
Robert S. Marticello, State Bar No. 244256
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Telephone:  714 445-1000
Facsimile:  714 445-1002
Email:  lekvall@swelawfirm.com
           kandrassy@swelawfirm.com
           rmarticello@swelawfirm.com
Attorneys for Appellant, Heide Kurtz. Plan Trustee

## <u>CERTIFICATE OF COMPLIANCE</u>

(Federal Rule of Bankruptcy Procedure 8015(a)(7))

I, Lei Lei Wang Ekvall, certify that:

Pursuant to Federal Rule of Bankruptcy Procedure 8015(a)(7), the foregoing brief, including the tables, contains 13,593 words, according to the word count performed by Microsoft Word, and therefore, it meets the requirements of Rule 8016(d)(2)(B)(i).

RESPECTFULLY SUBMITTED this 13th day of October, 2017.

/s/ *Lei Lei Wang Ekvall*
SMILEY WANG-EKVALL, LLP
Lei Lei Wang Ekvall, State Bar No. 163047
Kyra E. Andrassy, State Bar No. 207959
Robert S. Marticello, State Bar No. 244256
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Telephone:  714 445-1000
Facsimile:  714 445-1002
Email:  lekvall@swelawfirm.com
           kandrassy@swelawfirm.com
           rmarticello@swelawfirm.com
Attorneys for Appellant, Heide Kurtz. Plan Trustee

2723350.1

-52-

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF ORANGE**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Orange, State of California.  My business address is 3200 Park Center Drive, Suite 250, Costa Mesa, CA 92626.

On October 13, 2017, I served true copies of the following document(s) described as **OPENING BRIEF OF APPELLEE AND CROSS-APPELLANT** on the interested parties in this action as follows:

**BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on October 13, 2017, at Costa Mesa, California.

*/s/ Heather Davis*
Heather Davis